319 So.2d 766 (1975)
Oliver LINER
v.
LOUISIANA LAND AND EXPLORATION COMPANY.
No. 55750.
Supreme Court of Louisiana.
June 23, 1975.
Rehearing Denied September 25, 1975.
*768 Stanwood R. Duval, Jr., Duval, Arceneaux & Lewis, Houma, for plaintiff-applicant.
Donald L. Peltier, Peltier & Peltier; Thibodaux, J. B. Miller, Lawrence K. Benson, Jr., Milling, Benson, Woodward, Hillyer & Pierson, New Orleans, for defendant-respondent.
DIXON, Justice.
This possessory action was brought by Oliver Liner against Louisiana Land and Exploration Company as a result of conflicting claims to marshlands in Terrebonne Parish. Liner's land, he claims, lies in Sections 30, 31 and 32 of Township 20 South, Range 16 East, and in Sections 25 and 36 of Township 20 South, Range 15 East, all in Terrebonne Parish. The portion in dispute is the western end, west of the range line which separates Range 15 from Range 16. Liner's title, in the record before us, includes only land in Range 16. Louisiana Land and Exploration Company's record title covers all that portion of Liner's claim lying in Range 15.
All the land involved is marshland. It forms, roughly, a parallelogram 2909 feet on the easterly side, 6823 feet on the northerly side and 7036 feet along the southerly side. Liner claims that the westerly boundary of his property is the easterly bank of Bayou Dufrene (also known as Ash Point Bayou). Defendant claims Liner's westerly boundary is the line dividing Ranges 15 and 16.
The portion in dispute, which Liner claims that he and his family have possessed as owner for over one hundred years, is bounded on the west side by the east bank of Bayou Dufrene, and is adjacent to Liner's land in Range 16 East. The northern boundary of the disputed claim is about 580 feet in length and runs from Bayou Dufrene easterly through the marsh to the range line. The range line forms the easterly boundary of the disputed tract for about 3000 feet. The south line of the disputed tract runs about 2100 feet between the range line and the east bank of Bayou Dufrene.
The trial court gave judgment in favor of the plaintiff, finding that the evidence strongly supported his claim of possession. The Court of Appeal reversed (303 So.2d 866 (1974)), holding that the construction in the year 1956 and the continued operation of the Tennessee Gas Transmission Company's 24 inch gas pipeline disturbed Liner's possession, and that the disturbance was continuing and uninterrupted, a "usurpation" permitted by Liner for a period in excess of one year.
We granted writs in this case because it appeared that the construction of the pipeline *769 across Liner's claim was with his permission, and not such a usurpation (C.C. 3449) as would result in the loss of possession by Liner. See also C.C. 3490.
Oliver Liner's contention is that he and his family have possessed the land involved since the acquisition of a tract of land by Jacob Liner, Oliver's grandfather, in 1869. The description of the property acquired by Jacob Liner was: "A certain tract of land situated on both sides of the Bayou DuLarge in this parish of Terrebonne and described on the plan of said land on file in this office for reference as Lots Nos. 45 and 46 in Township 20 S. Range 16 E. measuring Fourteen arpents and Eighty-Three feet front on both sides of said Bayou with the depth of survey on confirmation, bounded as shown on said plan afore-referred to."
The plan, or survey, referred to in the deed is apparently no longer in existence.
Jacob Liner's widow sold the land to Pleasant Liner in 1910 by the same description, except that the description was enlarged to say that the tract was located "about 28 miles below the town of Houma" and was said to be bounded "above by land of est. A. St. Martin or assigns, and below by land of est. A. St. Martin or assigns. . ."
Oliver Liner's deeds of acquisition of undivided interests from his kinsmen in 1928 contained the same description.
In spite of having no record title to land in Range 15, the Liner family, from earliest times, occupied and used all the land which lay between Bayou Dufrene and Bayou DuLarge, treating Bayou Dufrene as the western boundary of the Liner tract. Unlike the defendants in Buckley v. Dumond and Theriot, 156 So. 784 (La.App. 1934), which involved neighboring swampland, the Liner family possessed as owners.
Oliver Liner was seventy-seven years old at the time of the trial in 1973. For fifty-six years, he testified, he had occupied this land, trapping, raising cattle, and raising his family. For three or four months of each year, during the trapping season, the family would occupy a "camp" constructed on the bank of Bayou DuLarge.
Before 1909, his grandfather and an aunt lived in houses constructed on the bank of Bayou DuLarge. That part of the property used as a farm lay on the westerly side of Bayou DuLarge, and was fenced on the north and south sides between Bayou DuLarge and Bayou Dufrene. These houses and the fence were destroyed by a devastating storm in 1909. Oliver Liner and his family were also living on his grandfather's place in 1909.
Oliver's grandfather planted cotton, pecan trees and orange trees on the farm, and raised cattle. Liner testified that he helped his father replace the fences on the upper end after the storm of 1909, and some fence remained along the northern boundary until about twenty years before the trial. The southerly boundary was marked with stakes after the fence was destroyed, and the stakes along the property line were continually maintained by Liner and his family. One engineer who surveyed the property found evidence of old stakes and markers beneath the water line at almost every place where one of Liner's markers was located.
Each year Oliver Liner followed a practice of burning the marshthe beneficial nature of which practice is not explained by the record. (There was some testimony that this practice made the disputed tract "too poor to trap."). Although the burning sometimes destroyed some of the property line stakes, they were replaced, indicating continuing activity on the part of the Liners in inspecting and replacing the boundary stakes.
The quality of the marshland deteriorated after the 1909 storm. Liner, however, continued to make his living on the land, *770 using it all for the purposes of trapping and for raising cattle. The Liner boundaries, as staked by Jacob Liner, were recognized by other trappers in the area, even those employed by agents of Louisiana Land and Exploration Company. Oliver Liner and his family occupied the camp on the property every trapping season, for the purpose of tending the traps. Oliver Liner himself only missed the season preceding the trial of this case, having suffered a stroke; and during that season his unmarried son, Randolph, who lived with Oliver Liner, trapped the land involved in this litigation.
Liner's cattle raising activities consisted of running a herd of cattle of between one hundred fifty to two hundred head along the banks of Bayou DuLarge for about ten miles, having made some arrangement with the owners of adjoining tracts.
The only source of income for Oliver Liner disclosed by the record during his entire life is the land which he thought he owned. There is no evidence in this record of any occurrence which might have cast any doubt upon the extent of Liner's ownership until a survey of Louisiana Land and Exploration Company properties in 1952. As a result of that survey, Louisiana Land and Exploration Company set two concrete markers and two iron pipes with Louisiana Land and Exploration Company signs along the 3000 feet of the range line which Louisiana Land and Exploration Company claims is the boundary between its land and Oliver Liner's. The concrete markers were located at a section corner and a quarter section corner along the range line.
In February of 1956 Oliver Liner granted Tennessee Gas Transmission Company a pipeline right-of-way over land described as follows:
"A Certain tract of land, situated on both sides of Bayou du Large, in the Parish of Terrebonne, and described as lots #45 & 46 in T. 20 S., R. 16 E., measuring 14 Arpents and 83 Feet front on both sides of said Bayou, with the depth of survey or confirmation."
The record leaves no doubt but that Oliver Liner intended to grant a pipeline right-of-way across all the land he owned. Contrary to the finding of the Court of Appeal, there was no loss of possession "against his consent." The pipeline canal and the pipeline which crossed Liner's land were constructed with his knowledge and consent.
In 1958 Louisiana Land and Exploration Company undertook to mark the boundaries of its holdings in this area with a ditch, monuments and signs. The ditch was originally 6 feet wide and 4 feet deep, but had been somewhat widened by subsequent maintenance operations.
Oliver Liner testified that when he found the ditch on his land he did not know who had dug it, and saw no other activity. Therefore, he appropriated the ditch to himself, constructing bulkheads with planks at two points in the ditch. The purpose of the bulkheads was to minimize the intrusion of salt water with the tidal flow, and to maintain a source of fresh water for his cattle. These bulkheads remained in place until removed by Louisiana Land and Exploration Company in 1971. When removed, they were replaced by the Liners.
Several seismograph crews crossed the disputed area from 1958 to 1965, with permission from Louisiana Land and Exploration Company, only.
Louisiana Land and Exploration Company retracted its survey lines in 1965, following Hurricane Hilda, and undertook to clean out the boundary ditch. There was testimony by an engineer for Louisiana Land and Exploration Company that some of the Liner stakes were pulled up during this process.
*771 In 1971 when Louisiana Land and Exploration Company again undertook to clean its boundary ditch with an amphibious dragline, Liner's stakes were noticed by Louisiana Land and Exploration Company employees. On August 2, 1971 the boundary stakes were removed by the amphibious dragline. By August 17 it was reported that stakes were again in place along the Liner claim. On September 24 Louisiana Land and Exploration Company employees again removed the boundary stakes. On September 30 they returned and removed the remaining stakes. There was a confrontation with one of the Liners. On October 25 Louisiana Land and Exploration Company employees again removed the obstructions from the ditch and the Liner boundary markers.
On August 20, 1971 and on October 1, 1971 Oliver Liner's attorneys notified Louisiana Land and Exploration Company that their employees had reportedly removed Liner's boundary stakes. Louisiana Land and Exploration Company was requested to assist in the termination of such activities, in order to avoid legal proceedings. The defendant did not answer the letters, and no further action came to Liner's attention until February of 1972. On that occasion a Louisiana Land and Exploration Company crew, with deputies for protection, again removed Liner' boundary markers. Suit followed on February 9a possessory action alleging the February 3, 1972 incident as the disturbance of plaintiff's possession.
Defendant advances two main reasons for affirming the Court of Appeal. The first is that plaintiff has failed to prove possession within enclosures; the second reason is that the extensive activities of Louisiana Land and Exploration Company on the disputed property during the year preceding February of 1972 prevented a finding that plaintiff was in peaceful possession for the time required to maintain the possessory action.
The possessory action in Louisiana is governed by article 3658 of the Code of Civil Procedure:
"To maintain the possessory action the possessor must allege and prove that:
"(1) He had possession of the immovable property or real right at the time the disturbance occurred;
"(2) He and his ancestors in title had such possession quietly and without interruption for more than a year immediately prior to the disturbance, unless evicted by force or fraud;
"(3) The disturbance was one in fact or in law, as defined in Article 3659; and
"(4) The possessory action was instituted within a year of the disturbance."
The Code of Civil Procedure of 1960 revised the statutory basis for the possessory action in Louisiana. Yiannopoulos, Louisiana Civil Law Treatise, Vol. 2, § 138, fn. 245 (1967). The possessory action and the action in jactitation were combined; there was no intention in the Code of Civil Procedure of 1960 to otherwise change the law (except for some matters not here relevant). See Comment, C.C.P. 3658, 3659 and 3660.
C.C.P. 3658 requires the possessor to prove that he had possession at the time of the disturbance; that his quiet, uninterrupted possession shall have existed more than a year prior to the disturbance; that suit was instituted within a year of the disturbance.
Disturbance might have been one in fact or in law. The disturbance complained of in this suit is a disturbance in fact, defined in C.C.P. 3659:
"A disturbance in fact is an eviction, or any other physical act which prevents the possessor of immovable property or of a real right from enjoying his possession *772 quietly, or which throws any obstacle in the way of that enjoyment."
Possession is defined in C.C.P. 3660 as corporeal possession or civil possession preceded by corporeal possession. The redactors of the Code of Civil Procedure, with reference to article 3660, commented: "This article makes no change in the law, but is a restatement of its indirect sources and is declaratory of the established jurisprudence on the subject."
A change, however, in terminology with reference to possession was effected in the 1960 revision. C.C.P. 3660 states that a person is in possession of immovables when "he has the corporeal possession thereof, or civil possession thereof preceded by corporeal possession . . ." The Comment to C.C.P. 3660 explains the abandonment of the term "real and actual possession" of articles 43 and 49 of the Code of Practice.
The Civil Code approach to an understanding of possession begins with C.C. 3426 (possession is the detention or enjoyment of a thing), C.C. 3428 (natural possession is occupying a house, cultivating ground) and in C.C. 3430 ("the corporeal detention of a thing which we possess as belonging to us, without any title to that possession, or with a title which is void"). When possession is once acquired by "corporal" detention, the intention to possess as owner might continue, even though the possessor "may have ceased to have the thing in actual custody . . ." C.C. 3442.
The intention of retaining possession is always supposed, "where a contrary intention does not appear decidedly . . ." C.C. 3443. A possessor loses possession "against his consent" when he is driven off or prevented from returning, or when he allows the usurpation of the estate for a year without "having done any act of possession. . ." C.C. 3449.
Possession commenced by corporeal possession (for acquisition by thirty years prescription) is "preserved by external and public signs, announcing the possessor's intention to preserve the possession of the thing, as the keeping up of roads and levees, the payment of taxes, and other similar acts." C.C. 3501.
The concept of possession is neither simple nor precise. (See Riseman, Elementary Considerations in the Commencement of Prescription on Immovable Property, 12 Tul.L.Rev. 608 (1938). The quality of possession required in a particular case depends not only on its classification as good faith or bad faith possession, but also on the type of land in dispute.
". . . Obviously the corporeal possession requisite in the case of agricultural land should not be the same as that in the case of wood land or swamp land, and it is submitted that the courts, in deciding whether the possession has been sufficient to commence prescription, first of all observe the type of land with which they are dealing.12
12. This suggestion seems obvious enough. Certainly more possession should be required in the case of farm land than in the case of wood land, and more possession in the case of wood land than in the case of swamp land. In the case of swamp lands and certain types of wood lands, very little can be done which might indicate the taking of possession, and if the courts were to require as much corporeal possession in the case of this type of land as in the case of other types of land, it is submitted that the former could never be prescribed. See Chamberlain v. Abadie, 48 La.Ann. 587, 590, 19 So. 574, 575 (1896), in which the court was of the opinion that: "The carporeal possession necessary to support the prescription is governed by the use for which the land is destined'; and Bogani v. Pacific Imp. Co., 111 La. 1063, 1070, 36 So. 129, 131 (1904), where the court stated: "That which is essential for actual possession changes with the nature of the property. It is different when it relates to one kind, from what it is when it relates to another.' In this connection see Ellis v. Prevost, 13 La. 230 (1839); Dodeman v. Barrow, 11 La.Ann. 87, 91 (1856), dissenting opinion of Merrick, C. J.; Giddens v. Mobley, 37 La.Ann. 417 (1885); Nugent v. Urania Lumber Co., 16 La.App. 73, 133 So. 420 (1931); Buckley v. Dumond, supra note 10." 12 Tul.L.Rev. 608, 610-611.
*773 The possession required to bring a possessory action has been treated as being the same required to commence the running of prescription.
". . . Observation of the cases38 on the subject leads to the conclusion that the court looks for the same sort of actual possession in the case of one attempting to bring a possessory action as it does in deciding whether or not possession has been sufficient to commence prescription.
38 Ellis v. Prevost, supra note 5; Davis v. Dale, 2 La.Ann. 205 (1847); Dickson v. Marks, 10 La.Ann. 518 (1855); Searles v. Costillo, supra note 19; Millard v. Richard, 13 La.Ann. 192 (1858); Dooley v. Gibson, 32 La.Ann. 192 (1880); Handlin v. Weston Lumber Co., 47 La.Ann. 401, 16 So. 955 (1895); State ex rel. Kenner v. Rost, 50 La.Ann. 995, 23 So. 975 (1898); Ramos Lumber Co. v. Labarre, 116 La. 559, 40 So. 898 (1905); Hanson Lumber Co. v. Baldwin Lumber Co., supra note 5; Hanson Lumber Co. v. Riggs Cypress Co., supra note 35; Ciaccio v. Hartman, 170 La. 949, 129 So. 540 (1930); Collins v. Heath, 35 La.App. 370, 131 So. 479 (1930)." 12 Tul. L.Rev. 608, 614.
Oliver Liner's possession of the disputed property satisfies all requirements for bringing the possessory action. The nature of the possession changed as the character of the marsh changed. From 1909, when the land was fenced and subject to some cultivation, the land deteriorated until the north boundary fence was abandoned after 1920. But the fence lines were continually marked. The camp was occupied each year. Trapping continued over the entire claim. Other trappers recognized Liner's boundaries. Hunters and fishermen used Liner's property only with his permission. He burned the prairie marsh every year. He ran his heard of cattle on the land.
Liner's claim continued to have visible boundaries until Louisiana Land and Exploration Company destroyed them. His possession had been preserved by "external and public signs" (C.C. 3501) recognized by neighbors.
Nor did Louisiana Land and Exploration Company's "acts of possession" dispossess Liner. The 1952 survey did not. The boundary ditch was appropriated by him to his own use. The water control structure on Bayou Dufrene extended only to the east bank of that stream, which Liner claimed as his westerly boundary. The seismic explorations, although an act of possession, did not serve to end the possession of Liner nor to evict him. The Tennessee Gas Transmission Company's pipeline ditch was dug with Liner's consent  not against it.
Defendant's second argument is based on subparagraph (2) of C.C.P. 3658 which requires the possessor to allege and prove that he "had such possession quietly and without interruption for more than a year immediately prior to the disturbance, unless evicted by force or fraud." Defendant would interpret the article literally, and maintains its actions for the year before February 3, 1972 prevent any conclusion that Oliver Liner had the quiet uninterrupted possession. The activities relied on by Louisiana Land and Exploration Company are: the August 2, 1971 cleaning of the property line ditch; the August 4, 1971 pulling of Liner's stakes and the continued cleaning of the ditch; the use of an air horn to communicate between the dragline and the marsh buggy while cleaning the ditch; the presence of no trespassing signs along the ditch; the August 17, 1971 removal of the stakes Liner had used to replace those previously removed by Louisiana Land and Exploration Company; the awareness by Liner of the August 17 operation; the September 24 and September 30, 1971 removal of Liner's property line stakes, and Liner's awareness shown by his *774 attorney's letter to the defendant; the October 25, 1971 removal of stakes and obstructions in the property line ditch; and, finally, the February 3, 1972 operation which precipitated the suit.
The redactors' comments make it clear that no additional requirements for bringing the possessory action were intended by the revision in 1960. "This article makes no change in the law" is the first sentence in the redactors' comment under C.C.P. 3658 and is the first clause in the comment under C.C.P. 3660. The intention is obvious that the redactors (as has the court, for more than a century, see Ellis v. Prevost, 19 La. 251 (1841) ) correlated the possessory action of the Code of Practice and the Code of Civil Procedure with the Civil Code articles relating to the right of a possessor to maintain himself in possession or to regain possession. C.C. 3454.
The evidence in this case leaves no doubt but that Oliver Liner had the corporeal possession of the property here in dispute for many years. The quality of his possession was that of owner. It extended to visible boundaries. It was neither precarious, clandestine, violent nor ambiguous. Aubry & Rau, Civil Law Translations, Vol. 2, § 180 (1966). One having acquired the corporeal possession of an immovable does not thereafter lose it against his consent except in the manner prescribed by law. "Possession," say Aubry & Rau, supra, § 179, "is not necessarily lost just because a third person has occupied the immovable. It is lost only if he remains occupied for a year (Art. 2243). If the former possessor lets this period elapse without any act of enjoyment or any claim for return of possession, he is considered as having lost it, whether he did or did not know of the adverse occupancy."
Our Civil Code provisions make it clear that one who has acquired corporeal possession continues in possession until he transfers it or abandons it, or until another expels him from it, or until he permits the estate to be usurped and held for a year without doing any act of possession or without interfering with the usurper's possession:
"Art. 3442. When a person has once acquired possession of a thing by the corporal detention of it, the intention which he has of possessing, suffices to preserve the possession in him, although he may have ceased to have the thing in actual custody, either himself or by others."
"Art. 3443. This intention of retaining possession is always supposed, where a contrary intention does not appear decidedly; so that, although a person may have abandoned the cultivation of his estate, he shall not therefore be presumed to have abandoned the possession, but shall be presumed on the contrary to have the intention of retaining it, and shall retain it in fact."
"Art. 3444. To retain the possession of a thing when a man once has it, it is not even necessary that he should have such positive intention; a negative intention suffices, that is, it suffices that the positive intention, which he had in acquiring the possession, shall not have been revoked by a contrary intention; for, so long as this revocation does not take place, the possessor is supposed always to retain his first intention, unless a third person has usurped or taken from him the possession, or he has failed to exercise an actual possession for ten years."
"Art. 3447. Possession of a thing may be lost either with or without the consent of the possessor."
"Art. 3448. Possession is lost with the consent of the possessor:
"1. When he transfers this possession to another with the intention to divest himself of it.

*775 "2. When he does some act, which manifests his intention of abandoning possession, as when a man throws into the street furniture, or clothes, of which he no longer chooses to make use."
"Art. 3449. A possessor of an estate loses the possession against his consent:
"1. When another expels him from it, whether by force in driving him away, or by usurping possession during his absence, and preventing him from re-entering.
"2. When the possessor of an estate allows it to be usurped and held for a year, without, during that time, having done any act of possession, or interfered with the usurper's possession."
Continuous and uninterrupted possession for thirty years, even in bad faith, is a method of acquisition of ownership of immovables. C.C. 3500. C.C. 3501 explains that such prescription may be preserved, if it has not been interrupted, as follows:
"The possession necessary for this species of prescription, when it has commenced by the corporal possession of the thing, may, if it has not been interrupted, be preserved by external and public signs, announcing the possessor's intention to preserve the possession of the thing as the keeping up of roads and levees, the payment of taxes, and other similar acts."
The interruption referred to in C.C. 3501 is also explained.
"Art. 3516. There are two modes of interrupting prescription; that is, by a natural interruption, or by a legal interruption."
"Art. 3517. A natural interruption is said to take place when the possessor is deprived of the possession of the thing during more than a year, either by the ancient proprietor or even by a third person."
"Art. 3518. A legal interruption takes place, when the possessor has been cited to appear before a court of justice, on account either of the ownership or of the possession; . . ."
The Civil Code articles, the ancient foundation for the possessory action in Louisiana, with which the redactors of the Code of Civil Procedure intended to harmonize, are:
"Art. 3454. Rights, which are common to all possessors in good or bad faith, are:
"1. That they are considered provisionally as owners of the thing which they possess, so long as it is not reclaimed by the true owner or person entitled to reclaim it, and, even after such reclamation, until the right of the person making it is established.
"2. That every person who has possessed an estate for a year, or enjoys peaceably and without interruption a real right, and is disturbed in it, has an action against the disturber, either to be maintained in his possession, or to be restored to it, in case of eviction, whether by force or otherwise.
"3. That such a possessor may, by prescription, acquire the property of the thing which he thus possesses, after a certain time, which is established by law according as he has possessed in good or bad faith."
"Art. 3455. The action which a possessor for one year has against a person disturbing his possession, to be maintained in it or restored to it, as is said in the preceding article, shall be decided before pronouncing on the question of ownership, and the real owner shall not *776 be allowed to repel it by endeavoring to prove his right."
"Art. 3456. But this, which is called the possessory action, must be commenced by the possessor within a year, reckoning from the time when he was disturbed; for if he leaves the person evicting him in possession for one year, without complaint, he shall lose his possession, whatever apparent right he may have had to it, and shall be driven to his action for the ownership of the property."
We must conclude then that the words "quietly and without interruption" do not mean that a possessor who suffers a "disturbance" on several occasions in the year preceding the suit has lost his right to bring the possessory action. The possessor may suffer disturbances throughout the year preceding the filing of the possessory action, and unless his possession comes to an end in such a way that he cannot show that he was in possession for more than a year prior to the disturbance complained of, he has the right to bring the action within a year of the disturbance.
A disturbance might interrupt possession. It might bring a corporeal possession to an end. (If, however, the disturbance results in an eviction by force or fraud, the one year possession requirement is eliminated). A disturbance may be an eviction, but it might also be "any other physical act which prevents the possessor of immovable property or of a real right from enjoying his possession quietly, or which throws any obstacle in the way of that enjoyment." C.C.P. 3659.
The acts of Louisiana Land and Exploration Company for the year preceding February 3, 1972 did constitute a disturbance of Liner's possession. However, he was not evicted. He and his son continued to trap on the disputed property. He continued to replace the boundary stakes removed by Louisiana Land and Exploration Company. Liner protested the August and September "invasions" by Louisiana Land and Exploration Company employees. Liner was not expelled, nor did he acquiesce in a usurpation. C.C. 3449.
C.C.P. 3658(2) cannot, without adding a new requirement to the possessory action, be read literally. It cannot mean that there must be no adverse claim for a year before the disturbance. "Quietly" appears in C.P. 49 and may be compared to "peaceably" in C.C. 3454, subd. 2, and in contrast to the violence referred to in C.C. 3491:
"A possession by violence, not being legal, does not confer the right of prescribing.
"That right only commences when the violence has ceased."
As stated in Aubry & Rau, supra, § 180:
"Possession is marred by violence, that means it is not peaceful, if it was acquired and continued by acts accompanied by physical or psychological violence.32
32. The defect of violence presupposes that the possession is acquired by active means. If the possession originates peacefully, it does not become defective if troubles related to it are caused by third persons; but there must be no natural interruption of the possession. . . ."
Consequently, we interpret the requirement of C.C.P. 3658(2) to mean that there must have been no interruption of the possession for one year, prior to the disturbance which caused the suit.
Oliver Liner has proven each of the requisite elements of the possessory action set out in C.C.P. 3658. He is entitled to a judgment of possession.
For these reasons, the judgment of the Court of Appeal is reversed and that of the district court is reinstated, at the cost of defendant-respondent.
*777 

*778 ON APPLICATION FOR REHEARING
PER CURIAM.
Our original opinion has adequately disposed of the contentions advanced by the application for rehearing. However, a strong argument has been made that we have misapplied La.C.Civ.P. art. 3658(2). This provision states, that, to maintain the possessory action, the plaintiff possessor must allege and prove that: "He and his ancestors in title had such possession quietly and without interruption for more than a year immediately prior to the disturbance, unless evicted by force or fraud * * *."
The applicant points out that in our opinion we pointed out several acts by which the defendant Louisiana Land disturbed the plaintiff Liner's "quiet" possession during the year prior to the February 3, 1972 disturbance alleged as the basis for this suit.
The defendant correctly points out that each of these acts was a disturbance of possession which would entitle Liner to bring this possessory action, just as did the February 3, 1972 disturbance.[1] Thus, Louisiana Land contends, due to these late 1971 disturbances, plainly Liner did not possess "quietly and without interruption" during the year preceding the February 3, 1972 disturbance upon which this suit is based.
This contention overlooks that the term to possess "quietly and without interruption", as used in the Louisiana Code of Civil Procedure (and by Article 49(2) of the Louisiana Codes of Practice of 1825 and 1870 preceding it), is equated with its traditional meaning in the Louisiana Civil Code. There, as a substantive right of possession, the Code recognizes the right of a possessor for a year or more who has possessed "peaceably and without interruption" to bring a possessory action against one who disturbs his possession. Louisiana Civil Code of 1808, art. 23, p. 478; Louisiana Civil Code of 1825, art. 3417(2); Louisiana Civil Code of 1870, art. 3454(2). See Art. 3454, La.C.C.Comp.Ed. in West's LSA-C.C., pp. 656-57 (1972).
Under the Civil Code, possession is not interrupted when it is merely disturbed. A possessor does not lose possession against his consent unless he is forcibly expelled or unless the disturber usurps possession and holds it for more than a year. See Civil Code Article 3449, which declares:
"A possessor of an estate loses the possession against his consent:
1. When another expels him from it, whether by force in driving him away, or by usurping possession during his absence, and preventing him from re-entering.
2. When the possessor of an estate allows it to be usurped and held for a year, without, during that time, having done any act of possession, or interfered with the usurper's possession."
Similarly, in speaking of interruption of prescription (rather than of possession) Article 3517 of the Louisiana Civil Code declares that "a natural interruption is said to take place when the possessor is deprived of the possession [enjoyment]* of the thing during more than a year, either by the ancient proprietor or even by a third person".[2]
Thus, an interruption of possession for purposes of the possessory action coincides with an interruption of acquisitive prescription under Article 3517 of the *779 Civil Code. (Moreover, if so interpreted, the loss of the right to possess under Article 3449(2) of the Civil Code coincides in time with the acquisition of the right to possess by another under Articles 3454(2) and 3456 of the Civil Code.)
We therefore conclude that one may possess quietly and without interruption for more than a year so as to be entitled to bring a possessory action, La.C.Civ.P. art. 3658(2), even though during that year disturbances in fact or law have occurred, La.C.Civ.P. art. 3659.
The application for a rehearing is denied.
Rehearing denied.
TATE, J., assigns additional concurring reasons.
BARHAM, J., did not participate.
TATE, Justice (concurring in denial).
The writer subscribes to the majority opinion and to the denial of rehearing. The additional sources and analysis are set forth below for what aid they may be in study for future applications of the article.
The Louisiana Civil Code and the Louisiana Code of Civil Procedure draw a distinction between a disturbance in fact that results in eviction and such a disturbance that falls short of eviction. In the first case, the possessor is evicted, and the person who caused the disturbance may commence to possess for himself. In the second case, the disturbance merely questions or places an obstacle to the enjoyment of quiet possession. Civil Code Article 3454 (2); La.C.Civ.P. arts. 3655, 3658(4), 3659.
Under the facts before us, as the majority states, Louisiana Land's acts clearly amounted to no more than a disturbance. They did not amount to an eviction. Nevertheless, whether an eviction or a disturbance, the possessor must within a year bring the possessory action. La. C.Civ.P. art. 3658(4).
The underlying issues, however, concern when a disturbance of possession constitutes an eviction and when an eviction is of sufficient magnitude or duration as to terminate the original possessor's undisturbed possession.

I
According to Article 3658(2) of the Louisiana Code of Civil Procedure, the plaintiff in a possessory action must allege and prove that he and his ancestors in title had possession of the immovable property or real right "quietly and without interruption. . . for more than a year immediately prior to the disturbance, unless evicted by force or fraud (Italics mine.) This provision was derived from Article 49(2) of the Codes of Practice of 1825 and 1870. This prescribed that the plaintiff in the possessory action ought to have possession "quietly and without interruption. . . for more than a year previous to his being disturbed," unless he had been evicted by force or fraud (Italics mine). An official comment under Article 3658 of the Louisiana Code of Civil Procedure indicates that "this article makes no change in the law."
The redactors of Article 49(2) of the Code of Practice used the words "without interruption" to convey the same idea as in Article 3417(2) of the Louisiana Civil Code of 1825, corresponding with Article 3454(2) of the 1870 Code. There, possessory protection is available to every person "who has possessed an estate for a year, or enjoys peaceably and without interruption a real right, and is disturbed in it" (Italics added). The provision reflects language used in Article 23, p. 478, of the Louisiana Civil Code of 1808, taken almost verbatim from the text of Pothier. See Pothier, Traite de la Possession, Chapter VI, No. 83, 9 Oeuvres de Pothier 291 (ed. Bugnet 1861). There is no corresponding provision in the French Civil Code.

*780 II
In drafting Article 23, p. 478 of the 1808 Code, however, the redactors were aware of Article 38, p. 482, which corresponds with Article 2229 of the French Civil Code. Article 38 declared: "Prescription requires a continued, uninterrupted, peaceable, public and unequivocal possession; it is also required that the person claiming the prescription shall have possessed animo domini, that is, as master or proprietor" (Italics added). This provision was amended in 1825, and eventually in substance became Article 3487 of the 1870 Code.
In speaking of interruption of prescription (rather than of possession), Article 3517 of the Louisiana Civil Code of 1870 declares that "a natural interruption is said to take place when the possessor is deprived of the possession [enjoyment] of the thing during more than a year, either by the ancient proprietor or even by a third person".
The relevant issue is: Should the same concept be applied to the interruption of possession? Is possession interrupted when the possessor is evicted or only when he has been evicted and stayed out of possession for a full year?

III
Possession is not interrupted when it is merely disturbed. Possession is interrupted when possession is lost. See 3 Planiol et Ripert, Traite pratique de droit civil francais 170 (2d ed. Picard 1952).
According to Article 3448 of the Louisiana Civil Code of 1870, possession is lost with the consent of the possessor by abandonment or by transfer to another person. The following Article 3449 declares:
"A possessor of an estate loses the possession against his consent:
1. When another expels him from it, whether by force in driving him away, or by usurping possession during his absence, and preventing him from re-entering.
2. When the possessor of an estate allows it to be usurped and held for a year, without, during that time, having done any act of possession, or interfered with the usurper's possession."
The latter provision was first adopted in 1825. It derives verbatim from the text of Pothier. See Pothier, Traite de la Possession, Chapter V, Article II, Nos. 73-76, 9 Oeuvres de Pothier 289 (ed. Bugnet 1861); Batiza, The Actual Sources of the Louisiana Project of 1823: A General Analytical Survey, 47 Tul.L.Rev. 1, 111 (1972). There is no corresponding provision in the French Civil Code.
Article 3449(2) of the Civil Code is closely related to the subsequent Article 3456. This latter provides that if the possessor "leaves the person evicting him in possession for one year, without complaint, he shall lose his possession, whatever apparent right he may have had to it, and shall be driven to an action for the ownership of the property." Article 3456 first appeared as Article 27, p. 480 in the 1808 Louisiana Code, having been derived verbatim from the text of Domat. See Domat, Book III, Title VII, Section I, No. 18, 2 Oeuvres de Domat 195 (ed. Remy 1829); Batiza, The Louisiana Civil Code of 1808: Its Actual Sources and Present Relevance, 46 Tul.L.Rev. 1, 131 (1971).

IV
The proper interpretation of Article 3449 of the Louisiana Civil Code of 1870, quoted above, raises the question: Does this article establish two modes of loss of possession or just one?
Paragraphs (1) and (2) of Article 3449 are joined disjunctively. Pothier, from whose text the provision derives, first says that "we lose the possession of an estate against our consent, when somebody evicts us", then goes on to say in a new paragraph that "a second manner whereby we *781 lose the possession of an estate against our consent is when we allow somebody to usurp it, who takes possession of it, and enjoys it for a year and a day, without us having made during this time any act of possession." 9 Oeuvres de Pothier 289 (ed. Bugnet 1861).
In France, in the absence of a provision in the Code Civil corresponding with Article 3449 of the Louisiana Civil Code of 1870, commentators indicate that possession is lost not merely upon eviction but upon the lapse of one year from eviction.
This conclusion is based on Article 2243 of the French Civil Code which corresponds with Article 3517 of the Louisiana Civil Code of 1870 and deals with the interruption of acquisitive prescription rather than of possession. See 2 Aubry et Rau, Droit civil francais 124 (7th ed. Esmein 1961): "Moreover possession is not necessarily lost by this alone that a third person takes hold of the immovable. According to our law, it is lost only when the occupation by a third person has lasted for more than one year. Article 2243. To the extent that the former possessor has allowed this term to lapse without re-entering in the enjoyment, or without bringing the action in order to recover it, he must be considered as having lost the possession, whether he knew or not of the usurpation; and that is so even if he has manifested his intention to be maintained in possession by means of a juridical act, such as the payment of a contribution."
Reading the two paragraphs of Article 3449 of the Louisiana Civil Code of 1870 as establishing two distinct modes of loss of possession may seem to be a tenuous interpretation. Logically, however, if possession is lost under 3449(1) upon eviction of the possessor, the second paragraph of the same article would be superfluous.
Pothier and the redactors of the Louisiana Civil Code of 1825 seem to have had in mind two distinct matters: on the one hand, loss of possession as loss of physical control; on the other, loss of the right to possess. Indeed, much confusion has resulted in Louisiana from the use of the word "possession" in the Civil Code and in the jurisprudence to denote both physical control and the right to possess.
For example, the word possession in Civil Code Articles 3426-3431, 3436-3438, means physical control over a thing that one has acquired with the intent to own it. (Possession as physical control leads, of course, to acquisitive prescription if it has the attributes required by Article 3487 of the Louisiana Civil Code of 1870.) This physical control alone, however, does not give rise to possessory protection or to acquisitive prescription. Possessory protection is predicated on acquisition of the right to possess. This right to possess is acquired by one who has been for a year in peaceable and uninterrupted possession of an estate. Civil Code Articles 3454(2), 3456; cf. id. art. 3449(2).
Exceptionally, however, possessory protection is accorded to any one who has been evicted by force or fraud, no matter how short the duration of possession. This is done in the interest of preservation of peace in society and as a deterrent against self-help. Technically, the action for the recovery of possession against a person who evicted another by force or fraud is not a possessory action. See 3 Planiol et Ripert, Traite pratique de droit civil francais 794 (2d ed. Picard 1952); Yiannopoulos, Civil Law Property § 132 (1966). Thus, if evicted by force or fraud, the original possessor may bring the possessory action even though he cannot prove the requisite year's possession prior to his eviction.

V
We may now return to the interpretation of Article 3658(2) of the Louisiana Code of Civil Procedure.
Does this provision contemplate interruption of possession by an eviction of any duration or only by an eviction that has lasted for more than a year?
In other words, does this provision contemplate interruption of possession by the *782 loss of physical control (Civil Code Article 3449(1)), or only interruption of possession by the loss of the right to possess (Civil Code Article 3449(2))? In the final analysis, the question is open to either interpretation and must be resolved in the light of policy considerations.
If possession is interrupted within the meaning of Article 3658(2) of the Louisiana Code of Civil Procedure by the mere loss of physical control at sometime during the period of one year immediately preceding the disturbance, consider the following illustration. A is disturbed in his possession by eviction or otherwise on January 4, 1974. He must bring the possessory action within one year and he must allege and prove that he was in possession on January 4, 1974, and that he was not evicted at all during the period between January 4, 1973, and January 4, 1974.
If possession is interrupted within the meaning of Article 3658(2) of the Louisiana Code of Civil Procedure by the loss of the right to possess during the period of one year immediately preceding the disturbance, consider the following illustration. A is disturbed in his possession, by eviction or otherwise, on January 4, 1974. He brings a possessory action on January 3, 1975, meeting the requirement of C.C.P. art. 3658(4). He must also allege and prove that he was in possession on January 4, 1974, and that he did not lose the right to possess during the period between January 4, 1973 and January 4, 1974. If he was evicted, at any time, for less than a year and recovered possession prior to January 4, 1974, he may still bring the possessory action. If he was evicted for more than a year but recovered possession prior to January 4, 1973, again he may still bring the possessory action. The possessory action is barred to him only if he recovered possession during the period from January 4, 1973 to January 4, 1974, after having been out of possession for more than a year, namely, if he was evicted prior to January 4, 1972, and his eviction lasted for more than a year.
The second interpretation is preferable. Under this interpretation, an interruption of possession for purposes of the possessory action coincides with an interruption of acquisitive prescription under Article 3517 of the Civil Code. Moreover, under this interpretation, the loss of the right to possess under Article 3449(2) of the Civil Code coincides in time with the acquisition of the right to possess by another under Articles 3454(2) and 3456 of the Civil Code.
This preferred interpretation accords with the apparent intent of the redactors of the Code of Practice and of the Code of Civil Procedure. The redactors intended to accord possessory protection to a person who acquired the right to possess under Civil Code Articles 3449(2), 3454(2), and 3487.
Thus, the legislative intent of the provisions of Article 49(2) of the Code of Practice and 3658(2) of the Code of Civil Procedure seems to be that possessory protection is available to anyone who has previously acquired the right to possess and did not lose it in the year immediately preceding the disturbance.

VI
Finally this interpretation also accords with French tradition, legislation, doctrine and jurisprudence.
Article 23 of the French Code of Civil Procedure declares that "possessory actions are admissible if brought within one year from the disturbance, by those who, since at least one year, were in peaceable possession by themselves or through others, by a nonprecarious title." Aubry et Rau observe that Article 23 does not give a complete enumeration of requirements, and, therefore, this article must be applied in combination with Article 2229 of the Code Civil. Thus, possessory protection is only available when the possession meets the requirements for acquisitive prescription: "It must be free of the vices of precariousness, clandestinity, and violence, it must be unequivocal, and, moreover, it must have lasted *783 in a continuous and uninterrupted manner during the period of time required for the acquisition of the right to possess." 2 Aubry et Rau, Droit civil francais 210 (7th ed. Esmein 1961).
The authors observe, however, that the requirements for acquisition of the right to possess need not exist in the year immediately prior to the disturbance. "It suffices that the previously acquired possession is not lost by a voluntary abandonment, or by an interruption for more than one year." Id. at 211.
Thus, under both the text of the French Code of Civil Procedure and relevant doctrine, possessory protection in France is available unless possession was lost by interruption for a period in excess of one year prior to the disturbance. See also 3 Planiol et Ripert, Traite pratique de droit civil francais 1970 (2d ed. Picard 1952). The interpretation of the Louisiana code provisions as declaring to the same effect is thus in accord with the doctrinal sources of our law and with the pertinent general scheme of our own Civil Code.
NOTES
[1] The possessory action of February 9, 1972 was actually brought within a year of the earliest 1971 disturbance. It was therefore timely if founded on these 1971 disturbances. La.C.Civ.P. art. 3658. However, we prefer not to rest our holding on that ground.
[2] An error in the English translation is noted: "possession" should be "enjoyment". See Art. 3517, La.C.C.Compiled Edition in 17 West's LSA-C.C. p. 688 (1972).